IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| vs. ) | No.: 13CR334 MV |
| ) | |
| CRYSTAL TORRES, ) | |
| ) | |
| Defendant. ) | |

## OBJECTIONS TO THE PRESENTENCE REPORT AND SENTENCING MEMORANDUM

COMES NOW, the defendant, Crystal Torres, by and through her attorney, John V. Butcher, Assistant Federal Public Defender, and objects to the guideline calculations in the instant cause. Additionally, Ms. Torres requested the Court impose a sentence that would avoid her serving any time in the Bureau of Prisons.

In support of her position, Ms. Torres states as follows:

### INTRODUCTION

1.  Ms. Torres suffers from significant mental and emotional issues and has significant health concerns. She has been diagnosed with Major Depressive Disorder, anxiety, Cluster B Traits, such as anti-social personality disorders, which results in great mistrust of others, and post-traumatic stress disorder. The instant offense comes as a direct result of Ms. Torres' depression. Ms. Torres' intention on January 22, 2012, was to commit suicide. Given that her motivation was to take her own life, incarceration will have little effect in deterrence for Ms. Torres, or other

individuals like her, that are attempting to commit suicide. Ms. Torres needs a sentence that while giving her structure, will allow her to continue with her many mental health and medical treatments.

2. Ms. Torres is currently undergoing both mental health and medical treatments and, thus, there is a grave concern that incarceration will have a severe negative impact upon both. Despite protestations to the contrary, the Bureau of Prisons will simply not meet Ms. Torres' mental health and medical needs. Furthermore, there is a significant risk that even a short incarceration could not only have severe negative consequences upon her treatment, but could give her a sense of hopelessness that would rekindled her suicidal indicia.

3. If the Court finds that a period of incarceration is necessary in order to impose a reasonable sentence, Ms. Torres will request that she be allowed to serve her period of incarceration through electronic monitoring pursuant to §5C1.1(e). If the Court departs and varies to an offense level of 11, the Court can impose up to fourteen (14) months of imprisonment that can be satisfied by home detention. A downward departure may be appropriate to accomplish a specific treatment purpose. §5H1.4, *See* §5C1.1, Application Note 6. This is also codified in 18 U.S.C. §3553(a)(2)(D) because a sentencing judge must look to the need for medical and other treatment in determining an appropriate sentence.

## OBJECTIONS TO THE GUIDELINE CALCULATIONS

4. Ms. Torres objections to the increase to her offense level pursuant to §3A1.2(c)(1) and §3C1.2. Section 3A1.2(c)(1) provides for a six (6) offense level

increase if the victim of the assault if a law enforcement officer, which Mr. Torres concedes, but the assault must also be done " in a manner creating a substantial risk of serious bodily injury. Section 3C1.2 can support a two (2) offense level increase if a defendant, "recklessly created a "**substantial** risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." [Emphasis added]

5.  Police officers had been called to investigate a disturbance between Ms. Torres and her live-in girlfriend. Ms. Torres had already left the home by the time the officers arrived. Upon making contact with Ms. Torres, Officer Gabaldon stated that Ms. Torres "held her arm straight to her sides, closed her eyes, held her head up and purposely walked into the traffic lanes of [New Mexico States Road] 68."[1] The officers said there was motor vehicle traffic that began to apply their brakes and to swerve to avoid from hitting Ms. Torres. The officers began to implore Ms. Torres to get out of the road. Ms. Torres does not deny that she attempted to be hit by a car.

6.  The traffic stopped and the cars were able to avoid hitting Ms. Torres. A further conversation took place between the officers and Ms. Torres. Ms. Torres had a small handyman pocket knife on her person from performing work around the house. When opened, the knife was a total of 7 inches long with a 3 inch blade. Ms. Torres does not dispute that she pointed the knife at law enforcement. The two

---

[1] Memorandum of Interview of Officer Bryan Gabaldon. However, the reports of other witnesses are consistent with Officer Gabaldon's interview.

law enforcement officers had plenty of time to draw their handguns. Ms. Torres, despite having the two weapons drawn upon her, kept advancing towards the officers. The officers understood that this was an attempted suicide. They pled with Ms. Torres to put the knife down and to let them "get her help." Unfortunately, the officer with the Tazer had only just arrived, and the officers were not able to deploy it.

7. Ms. Torres then reaffirmed her decision to die and made statements along the lines of "no one can help me now." Ms. Torres "looked up and made the sign of the cross on her chest with the same hand she was holding the knife." Ms. Torres then moved towards the officers. The officers discharged their firearms several times "into the center mass area of [Ms.] Torres' chest. [Ms.] Torres immediately hit the ground."

8. Ms. Torres does not challenge the purpose of §3A1.2(c) that those that create a substantial risk of serious bodily injury to police officer should receive a significant increase in their sentence.[2] However, the actions of Ms. Torres did not create a substantial risk of serious bodily injury to law enforcement officers. It is clear the intentions of Ms. Torres was to commit suicide, and her actual actions did not represent a substantial risk of serious bodily injury to the police officers. After opening the pocket knife, she allowed the officers to have plenty of time to draw and aim their weapons. There were further conversations. Moreover, she signaled

---

[2] While not perfect, the Sentencing Table is structured that a six (6) offense level increase will double a defendant's sentence.

her intent by making the sign of the cross with her knife hand before approaching the officers. In fact, if only had Deputy Marvin Armijo arrive a few moments earlier with a Tazer, the officers could have avoided shooting Ms. Torres altogether.

9. The fact that Ms. Torres pled guilty to Aggravate Assault against a tribal police officer, pursuant to 18 U.S.C. § 113(a)(3), does not mean that *per se* §3A1.2(c)(1) must apply. One is guilty of Aggravate Assault with a Dangerous Weapon if there was an "intent to do bodily harm." However, §3A1.2(c), requires the assault to be done "in a manner creating a substantial risk of serious bodily injury." The fact that in her crazed state, Ms. Torres possessed the knife with a sufficient intent to be guilty of 18 U.S.C. §113(a)(3) does not mean she committed the aggravated assault in a manner creating a substantial risk of serious bodily injury to either of the police officers. After signaling her intent, she moved towards two trained police officers who had their guns drawn and pointed at her chest. The manner of how she committee the offense was so the police officers would shoot her. Thus, in looking at the totality of the circumstances of what actually happened, there was never a substantial risk of serious bodily injury to the law enforcement officers. Ms. Torres asks the Court to look at the reality of the situation of what happened on that awful night.

10. It was not Ms. Torres' intention nor did her deeds or actions ever create a substantial risk of death or serious bodily injury to any other person that night, including law enforcement officers. She had absolutely no intent to "take other people with her." She just wanted to take her own life.

11.  For the above reasons, Ms. Torres also did not recklessly create a substantial risk of death or serious bodily injury to others, and thus, the enhancement for reckless endangerment during flight is not appropriate.[3] Even if Ms. Torres' conduct was reckless, it was not done during flight nor did it create a substantial risk of death or serious bodily injury. A substantial risk of death or serious bodily injury cannot be hypothetical or academic but it must be real and provable.

12.  The Presentence Report does not state how a substantial risk of death or serious bodily injury was created other than three cars narrowly avoided Ms. Torres. There has been no statement regarding how fast the cars were traveling or if their avoidance of Ms. Torres put them in risk of death or serious bodily injury. It is all hypothetical and conjecture. The evidence in the police reports and the concomitant Offense Conduct, only shows that the cars were able to avoid Ms. Torres and that none of them were involved in any accident. "Abruptly slowing down" or in more common terms "hitting the brakes" is a very common occurrence in automobile travel and cannot be said to create a substantial risk of death or serious bodily injury. Moreover, given the totality of the circumstances, the conduct of Ms. Torres is not the type of Ms. Torres in the heartland of what is contemplated by the guideline. The fact that her conduct may have created a risk of property damage, i.e., the car hitting Ms. Torres, is not sufficient to apply the enhancement. Even if Ms. Torres'

---

[3] Paragraph 24 states that §3C1.2 is an adjustment for obstruction of justice. It is believed that this is a typo. §3C1.2 provides for an enhancement for reckless endangerment during flight.

conduct created a risk of bodily injury, that would not be enough to apply the enhancement.

13. While not argued, Ms. Torres would also object for an offense level enhancement to be applied pursuant to §3A1.2(b) because her actions were not motivated due to the status of the law enforcement agents. See §3A1.2, Application Note 3. The facts of the case make clear that Ms. Torres was attempting to commit suicide. Since she was unsuccessful in stepping out into traffic, she decided to get shot. Thus, the fact that the individuals were law enforcements officers were unrelated to her crime except for the fact that they were armed.

## SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD DEPARTURE AND VARIANCE

14. Regardless of the rulings on Ms. Torres' sentencing objections, Ms. Torres seeks a sentence that does not require placement at the Bureau of Prisons. It should be the capital concern of society to treat Ms. Torres, not to punish her. Especially if that punishment would have severe negative consequences to her emotional and physical health that is not warranted by her offense. The Court should look at the instant offense as an attempted suicide not as a violent attack upon law enforcement officers. It is clear from a close examination of the facts, the law enforcement officers' safety was never in jeopardy. Given that it was Ms. Torres' intent to be shot, she gave the officers not only sufficient time to draw and aim their weapons at her chest, but then made an exaggerated signal to them before she approached. By

using the hand that was holding a knife to make the sign of the cross, Ms. Torres could not have made it clearer that she wanted to be shot.

15. By saying that the officers' safety was not in danger, Ms. Torres does not mean to diminish the emotional toll that her actions took upon them or upon those that were driving on the state road. There is no doubt that her actions were extremely disconcerting and may have weighed heavy on their conscious.

16. However, the guidelines concerning the aggravated assault of the police officers are written to protect their physical, not emotional, safety. Thus, the actions of Ms. Torres in the instant offense are greatly outside the heartland for the type of conduct contemplated under the sentencing guidelines. Moreover, the purpose of 18 U.S.C. §3553(a) would not be served by a sentence of incarceration.

17. As stated in the Presentence Report, Ms. Torres has multiple mental health and medical problems predating the events of this case. Being shot twice in the chest only exasperated her pre-exiting mental health and medical problems. As noted in the Presentence Report, she is currently seeing a bevy of doctors and undergoing both medical treatments and mental health counseling. Recently, she has had several bouts of pneumonia requiring hospitalization including in the intensive care unit. She also has been recently placed on a CPAP machine.

18. As the letter from Dr. Joseph Jaros indicates, Ms. Torres has active medical problems including chronic pain secondary to the gunshot would, hypertension, post-traumatic distress syndrome, obesity, anxiety and depression. Ms. Torres is

currently taking morphine and oxycodone – acetaminophen. Dr. Jaros has indicated defendant's incarceration may lead to medical issues if the medical is not continued.

19. The Bureau of Prisons response to Ms. Torres' medical condition is far from comforting. It is hard to image what more she needs to justify her medical treatment than the documents that have already been submitted to the Probation Office. While they may let her keep her CPAP machine, they simply stated that they will use "preventative measures for withdrawal" after removing her pain medications and that she would receive "an equivalent morphine or oxycodone for pain management" if they determine she will needs it. Obviously, if Ms. Torres could be on lesser medications, her current physicians would describe it.

20. More disturbing than disruption of her medical treatments, would be the interruption to her mental health treatment. As the letter from Dr. J.W. Luzius, M.D. from the Indian Health Services indicates, Ms. Torres suffers from post-traumatic stress disorder, depression and anxiety[4]. "Ms. Torres has had benefit from her therapy and medications but it not fully stable and at risk for relapse to more severe symptoms with increased stress. The process of treatment has the best results when it is consistent and uninterrupted. The medications are important as adjunctive measures where the therapy is the mainstay of the overall treatment. It is the doctor's opinion that there "has been significant suffering from the trauma and punitive matters at present at problematic to justify."

---

[4] The letter has been previously provided to the Court.

21. Defense counsel has contacted Dr. Morton of the Indian Health Service for an update of Ms. Torres' treatment. It is believed Dr. Morton concurs with Dr. Luzius. Defense counsel will forward Dr. Morton's update.

22. It should be noted that Dr. Luzius, Dr. Morton, and her other treatment doctors have no connection with the instant case and they are not retained by the defense. Dr. Luzius and Dr. Morton are employed by the Albuquerque Indian Health Center. Ms. Torres' other doctors are either part of the Indian Health Service or were chosen by her insurance company. Thus, the doctors' opinions are neutral and solely based on the medical and emotional needs of Ms. Torres.

23. The Court may grant a downward departure to accomplish a specific treatment purpose. §5H1.4, *see* §5C1.1, Application Note 6. Section 5H1.4 states that physical condition may be relevant in determining whether a downward departure is warranted if the condition, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. Specifically, §5H1.4 states an extraordinary physical impairment may be a reason to depart downward because "home detention may be as effective as, and less costly, than imprisonment." §5H1.4.

24. Application Note 6 to §5C1.1 states that in determining whether a departure is appropriate to allow an individual to serve his or her sentence on home confinement instead of in prison, the court should consider among other things, the likelihood that the completion of the treatment program will successfully address

the treatment problem, thereby, reducing the risk to the public from further crimes of the defendant and the corollary determination of whether the imposition of less imprisonment than required under the guidelines will increase the risk to the public from further crimes of the defendant.

25.  Placing Ms. Torres on a structured probation will all but eliminate her risk to the public. It is important that Ms. Torres maintain her medical and mental health appointments and treatment. In reality, Ms. Torres represents a greater danger to herself than to the public. Incarceration with the cessations of her medical and mental health treatments and medication, could destabilize her to the point that she is overwhelmed and depressed to the point of suicide. The instant offense was a suicide attempt and Ms. Torres needs additional time to stabilize her mental health condition as well her medical treatment.

26.  Although less stringent than the requirements for a downward departure, the same factors also support a downward variance pursuant to 18 U.S.C. §3553(a)(2). In addition to protecting the public from further crimes by the defendant, the Court is also specifically instructed to consider how to provide a defendant with needed medical care and other treatment "in the most effective manner." As stated before the Court should look at the instant offense as an attempted suicide and not as a true aggravated assault on a law enforcement officer. Thus, the normal considerations for a heartland offense under 18 U.S.C. §113(a)(3) do not apply. Individuals who are so distraught that they are attempting to commit suicide are not deterred by possible criminal sentences if their suicide attempt is unsuccessful. Nor is

incarceration necessary to reflect the seriousness of the offense or to provide a just punishment. Structured monitoring with treatment should be the capital concern.

27. Ms. Torres is well aware that the Court understands that its "over-arching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) *quoting* 18 U.S.C. § 3553(a). Underlying the federal judicial tradition is the principle that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. _____, _____, 131 S.Ct. 1229, 1240 (2011) *quoting Williams v. New York*, 337 U.S. 241, 247 (1949). In the instant case, both the crime and the needs of the offender support a sentence of structured supervision and continued mental health and medical treatment. Incarceration is not warranted in the instant case.

28. In fact, specialized conditions of supervision by the United States Probation Office can be a factor in supporting a downward variance. *United States v. Baker*, 445 F.3d 987, 992-93, (7th Cir. 2006). In *Baker*, the appellate court affirmed a significant downward variance in a child pornography conviction because the offender was going to receive appropriate counseling and intensive monitoring to make sure that he did not backslide or have unauthorized access to children. As Ms. Torres' time on pretrial release has indicated, she can be managed and supervised by the United States Probation Office so she is not a risk to the community, but can also attend the necessary mental health and medical treatment. Additionally, United

States Probation Office can supervise her while she is on the various prescriptions, including narcotic pain medication, by her licensed treatment providers.

29. Ms. Torres understands that her prior history of domestic abuse allegations may be of concern to the Court. Initially, the Court should know that Ms. Torres voluntarily entered long term treatment to address her domestic issues. Addition to having allegations of abuse, Ms. Torres has been the victim of domestic abuse.

30. Ms. Torres needs to continue her mental health training, including anger management and domestic relations, so that she can become stable and be in a stable relationship. One of the convictions against Ms. Torres is when Ms. Torres started hitting herself over the head with a glass ashtray. As Ms. Torres' history of self-abuse and suicide attempts indicates, she can become unstable in stressful situations. Imprisonment will not address these issues, but could increase her mental instability.

31. There is no doubt, despite the claims of the Bureau of Prison, that Ms. Torres' mental health and medical needs can be better met by continuing her current treatment. The safety of the community can be ensured by her continuing monitoring by the United States Probation Office. Moreover, if the Court wants additional assurances and/or punishment, the Court can place Ms. Torres on an electronic monitoring program.

## CONCLUSION

32. For the reasons stated above, Ms. Torres requests that this Court impose a sentence that does not include a term of actual incarceration in the Bureau of Prisons. Ms. Torres requests a long term structured period of supervision with the

condition that she maintain and complete mental health counseling and treatment, substance abuse counseling, as well as, her necessary medical treatment. Given that the instant offense was in reality an attempted suicide, neither the guidelines nor 18 U.S.C. § 3553(a) requires a term of incarceration to have a reasonable and just sentence. It must remembered that addition to any punishment that the court imposed, Ms. Torres was shot twice in the chest which has negatively impacted her already poor health and emotional stability.

WHEREFORE, based on the foregoing, Ms. Torres requests that this Court impose a sentence that does not require incarceration at the Bureau of Prisons but does require supervision by United States Probation Office and continued mental health and medical treatment.

I HEREBY CERTIFY THAT on the 26th day of February 2015, I filed the foregoing electronically through the CM/ECF system, which caused AUSA Elaine Ramirez to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

AND I FURTHER CERTIFY THAT on such date I served the foregoing by hand deliver/fax on the following non-CM/ECF Participants

Sandra Day, USPO

/s_____

Respectfully submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489

/s   [Electronically filed]
JOHN V. BUTCHER, AFPD
Assistant Federal Public Defend