IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Cr. No. 13-CR-334 MV |
| | ) | |
| vs. | ) | |
| | ) | |
| CRYSTAL TORRES, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS TO THE PRESENENTCE REPORT AND SENTENCING MEMORANDUM**

The United States of America, through its undersigned counsel, hereby responds in opposition to the defendant's objections to the Presentence Report (PSR) and Sentencing Memorandum.

I. ADDITIONAL INFORMATION FOR THE CONSIDERATION OF THE COURT

The facts described below are based upon the interviews conducted with Officers Gabaldon and Romero, as well as witnesses Marcel Povijua, Kasia Povijua, James Johnson, Karen Denalikai, all of whom witnessed the shooting. Statements were also taken from Valerie Willie, who called police at the request of Torres' girlfriend, Jane Doe.

On January 22, 2012, Jane Doer went to the apartment of Valerie Willie. Doe, who was barefoot and holding a hammer, requested Willie call police, stating "[s]he (Torres) is going to kill me." Doe later told law enforcement that she and Torres had a no contact order in place based on a previous domestic violence indictment, but the two were together. Torres became upset because Doe responded to a text message on Torres' phone. There were several reported and unreported incidences of domestic violence between the two women. In addition, Torres often spoke of killing herself, and also expressed a desire to commit "suicide by cop." Torres also

told Doe that if Doe called the cops, Torres would take Doe down with her. Torres also spoke of killing Officer Romero. On the date of the incident, Torres grabbed Doe by the hair and also by the neck of her T-shirt. Baker fought back and tried to take the T-shirt off. Torres held Baker down on the bed. When Baker told Torres that Torres was hurting her, Torres replied, "I'm hurting you? I'll show you hurt." Eventually, Torres allowed Baker to get up. Baker went to the parking lot to retrieve items from their car, just in case Torres left the residence. Baker then returned to the second floor of the apartment. Baker stated that Torres believed Baker had called police, and that Torres was holding a hammer behind her back. Torres held Baker down on the bed. Torres turned the claw of the hammer toward Banker and swung the hammer, striking the bed. Each strike landed closer to Baker's head. Torres told Baker "I'm going to kill you," and "I'm going to have fun doing this to you." Baker managed to push Torres off of her. Baker calmed Torres down and was able to grab the hammer. Baker tried to go downstairs but Torres grabbed her and pulled her back by the waist. Baker told Torres she had to use the restroom. When Baker got into the hallway, she ran down the stairs and to Willie's apartment, where she banged on the door until Willie answered.

Willie then called her boyfriend, Officer Gabaldon, to see if he was on duty. Gabaldon informed Willie he was conducting a traffic stop. Willie told Gabaldon that her neighbors were fighting, and to hurry to her apartment because one of the neighbors was there. Gabaldon contacted central dispatch and was able to contact Officer Romero. Romero acknowledged the call and requested an ambulance be sent to the apartment complex. Romero arrived at the apartment complex first and met with Willie and then with Doe. Doe told Romero that Torres "tried to kill me, she tried to kill me." Romero and Gabaldon then went looking for Torres at the apartment complex. Romero observed Torres walking very quickly eastbound toward State

Road 68. Romero instructed Gabaldon to block southbound traffic on State Road 68 with his patrol car, as Romero tried to catch Torres on foot. Torres appeared to be running to into traffic. Torres yelled to Romero to stay away, and that she was going to "f***ing do it." Romero observed Torres make a gesture on her forehead that appeared to be a cross, then she appeared to be praying. Torres then opened her arms, closed her eyes, and leaped into the right lane of State Road 68 (southbound lane). Three vehicles nearly struck Torres. Romero ran onto State Road 68 and stopped all southbound traffic. Torres then told Romero, "If this isn't going to do it I'll just f***ing kill you!" Torres then pulled out a hunting knife from a pouch she was carrying and began walking toward Romero. Romero drew his service weapon, and issued several commands to Torres to drop the knife and get on the ground. Torres ignored the commands and continued to advance on Romero. Romero began walking backward. Officer Gabaldon arrived and also drew his service weapon. Gabaldon also commanded Torres to drop the weapon, and allow the officers to help her. Torres continued to ignore the officers' commands, yelling to Gabaldon, "It's too late Bryce (Gabaldon), nobody can help me now." Torres then raised her hand carrying the knife, and began advancing more rapidly. Both Romero and Gabaldon continued to retreat. A Rio Arriba County Sheriff's unit then arrived at the location. Gabaldon yelled to the deputy to bring his tazer. Torres looked up, made the sign of the cross, then raised her hand with the knife point of the blade pointed outward toward Gabaldon. Torres yelled out loudly and began to sprint toward Gabaldon. Gabaldon fired two shots into the center mass area of Torres' chest and observed Torres fall backward onto the pavement. Torres attempted to get to her feet with the knife still in her hand. Romero kicked the knife from Torres' right hand and handcuffed her. Romero immediately called for an

ambulance and began to do basic first aid on Torres. After the arrival of medical personnel, Torres was transported to University of New Mexico Hospital in Albuquerque.

II. OBJECTIONS TO THE PSR

    A. Objection to application of USSG §3A1.2(c)(1)

The defendant objects to the application of USSG §3A1.2(c)(1) in paragraph 22 of the PSR, which resulted in a six-level increase as the officer was considered an official victim. The defendant concedes the victim was an officer, but states she did not create a substantial risk of serious bodily injury to the officer. Serious bodily injury means "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental facility; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 cmt. n.1(L). U.S.S.G. § 3A1.2(c)(1), however, requires only that a defendant create a substantial risk of serious bodily injury. As noted above, the defendant not only threatened the law enforcement officer with the weapon, the officers retreated as she advanced toward them. It was only when she began to run toward Officer Gabaldon with the knife that officers fired upon her. Furthermore, after being knocked to the ground by the officer's gunshots, the defendant had to have the knife kicked from her hand as she was struggling to get to her feet. The defendant's conduct created a substantial risk of serious bodily injury. Therefore the enhancement is correctly applied.

    B. Objection to application of USSG §3C1.2

Next, the defendant objects to paragraph 24 of the PSR for a two-level increase for creating a substantial risk of death or serious bodily injury to others pursuant to USSG §3C1.2, reckless endangerment during flight. The defendant alleges that although she ran out onto State Road 68, cars were able to avoid her and no accidents resulted from her conduct. The defendant maintains that her conduct, at most, only caused a risk to property damage or minor bodily injury.

4

Section 3C1.2 provides for a two-level enhancement "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." A defendant acts recklessly for purposes of this enhancement when he "was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *United States v. Conley,* 131 F.3d 1387, 1389 (10th Cir.1997).

In this case, the defendant ran into traffic on State Road 68. It was by sheer luck that she was not struck by a vehicle, or that vehicles did not strike one-another in an effort to avoid her. An officer, also on foot, had to run onto State Road 68 and stop all southbound traffic. The defendant created a substantial risk to motorists on State Road 68, and to the officer who was also on foot, who had to run onto the roadway to stop traffic. The application of USSC §3C1.2 is correct under these circumstances.

III.  SENTENCE PURSUANT TO 18 USC §3553(a)

The U.S. Sentencing Guidelines are advisory. *See United States v. Booker*, 543 U.S. 220, 234 (2005). Moreover, under the Supreme Court ruling in *United States v. Rita*, 551 U.S. 338 (2007), for appellate purposes, a reviewing court may accord a properly calculated sentence to have a presumption of reasonableness, *e.g.*, *Id.* at 347. A district court, on the other hand, cannot presume reasonableness, but in determining a sentence, it must conduct an analysis using both the Guidelines and the sentencing statutes. Both the sentencing judge and the (Sentencing) Commission "are carrying out the same basic § 3553(a) objectives, the one, at retail, and the other at wholesale." *Id*. at 345. Of particular import to the present sentencing memorandum filed by Defendant, the Court also held that the Guidelines can assumed to be a "rough approximation" of a sentence that would "achieve § 3553(a)'s objectives." *Id.* at 347-349. Hence, the district

5

court should impose sentences within the calculated guideline range when a departure is not appropriate because Guideline sentences prevent unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) and because the Sentencing Commission policies articulated in the Guidelines are sound and reasoned.

The additional sentencing factors that the court is to consider when imposing its sentence are found in 18 U.S.C. § 3553(a). Section 3553(a) states, in part:

> Factors to be considered in imposing a sentence.-The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (20 of this subsection. The court, in determining the particular sentence to be imposed, shall consider-
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed–
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established;
>
> (5) any pertinent policy statement;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

The United States recognizes the medical and mental health needs of the defendant are numerous. The United States defers to the Court regarding what it considers to be a reasonable

sentence, given the facts of the case, the needs of the defendant, and the need to protect the victims and the community.

WHEREFORE, for the foregoing reasons, the United States requests the Court deny the defendant's objections to the PSR, and find that the PSR is correctly calculated.  Further, the PSR indicates that the defendant's adjusted offense level is 23, with a criminal history category of I, resulting in a guideline range of 46-57 months.  The United States next requests that the court fashion a sentence that considers correctly calculated sentencing guideline range, the gravity of the defendant's conduct, the defendant's medical and mental health needs, and the need to protect the victims and the community.

Respectfully Submitted,

DAMON P. MARTINEZ
United States Attorney

*Electronically filed 3/5/2015*
ELAINE Y. RAMIREZ
Assistant United States Attorney
P.O. Box 607
Albuquerque, NM 87103
(505) 346-7274

I HEREBY CERTIFY that on the 5th
day of March, 2015, the foregoing pleading
was electronically filed through the CM/ECF
system which caused counsel of record to
be served electronically.

*/s/*
ELAINE Y. RAMIREZ
Assistant United States Attorney